WO                                                                                          MGD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Mark Thomas Grande, | No.   CV 20-01922-PHX-JAT (CDB) |
| Plaintiff, | |
| v. | **ORDER** |
| David Shinn, et al., | |
| Defendants. | |

Plaintiff Mark Thomas Grande, who was formerly confined by the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR), brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  Defendants move for summary judgment. (Doc. 33.)  Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 35), and he opposes the Motion (Doc. 44).  Also before the Court is Plaintiff's "Dispositive Motion and Exhibits" (Doc. 37), which the Magistrate Judge has construed as a Motion for Judgment as a Matter of Law pursuant to Rule 56 of the Federal Rules of Civil Procedure (Doc. 39) and the Court will refer to as Plaintiff's Cross-Motion for Summary Judgment.

**I.     Background**

On screening Plaintiff's Complaint (Doc. 1) under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment claim for deliberately indifferent dental care while he was incarcerated against Defendants ADCRR Director David Shinn (in his individual and official capacities), Centurion Healthcare, and Centurion Dentist

1   Olivarez (in his individual capacity) and directed them to answer the claim.  (Doc. 6.)  The

2   Court dismissed the remaining claims and Defendant.  (*Id.*)

3   **II.      Summary Judgment Standard**

4          A court must grant summary judgment "if the movant shows that there is no genuine

5   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

6   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

7   movant bears the initial responsibility of presenting the basis for its motion and identifying

8   those portions of the record, together with affidavits, if any, that it believes demonstrate

9   the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

10         If the movant fails to carry its initial burden of production, the nonmovant need not

11   produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

12   1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

13   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

14   contention is material, i.e., a fact that might affect the outcome of the suit under the

15   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

16   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

17   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

18   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

19   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

20   it must "come forward with specific facts showing that there is a genuine issue for trial."

21   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

22   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

23         At summary judgment, the judge's function is not to weigh the evidence and

24   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

25   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

26   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

27   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

28   . . . .

### III.     Discovery Issue

Plaintiff states in his Motion that he was released from ADCRR custody on March 4, 2021, and he did not receive the Court's scheduling Order for discovery dated March 8, 2021 until August 25, 2021, well after discovery had closed.  (Doc. 37 at 2.)

The docket reflects that the Court's March 8, 2021 scheduling Order set July 9, 2021 as the deadline for discovery, and September 6, 2021 as the deadline for dispositive motions.  (Doc. 15.)  On March 10, 2021, Plaintiff filed a notice that he was released from ADCRR custody on March 5, 2021.  (Doc. 16.)  Plaintiff provided his new address in Phoenix, and he asked that all filings and documents be sent to him at that address because he no longer had access to e-file.  (*Id.*)  On April 5, 2011, Plaintiff filed a motion stating that he was released from prison a couple weeks earlier and needed the Court to send him copies of everything filed since Doc. 11.  (Doc. 18 at 1.)  On April 8, 2021, Magistrate Judge Bibles granted the motion and directed the Clerk of Court to mail copies of Doc. 13 (Defendants' Answer) and Doc. 15 (Scheduling Order) to Plaintiff's new address.  (Doc. 20.)  The Clerk of Court mailed copies of Docs. 13, 15, and 20 that same day to the Phoenix address Plaintiff provided.  (*See* docket entry dated April 8, 2021.)  That mail was not returned to the Court.

Even assuming Plaintiff did not timely receive the Court's scheduling Order, Plaintiff does not identify what discovery he was lacking to prepare his own Motion for Summary Judgment or to respond to Defendants' Motion.  Plaintiff only states "since he was unfortunately rearrested [on June 13, 2021] due to a[n] old warrant, he was not able to depose or gather statements from witnesses he wishes to call at trial."  (Doc. 37 at 3.)  Plaintiff does not identify any of those witnesses or what information he anticipated they would provide.  To the extent Plaintiff is requesting any relief related to discovery issues, such relief is denied.

### IV.     Relevant Facts

Plaintiff arrived at Arizona State Prison Complex-Eyman in November 2019 and requested a dental appointment.  (Doc. 34 (Defs.' Statement of Facts) ¶ 1.)  In a Health

Needs Request (HNR) dated November 12, 2019, Plaintiff stated that he needed a lower denture made; the response said Plaintiff needed an intake exam before any routine treatment and Plaintiff was scheduled soon for the exam. (Doc. 37-3 at 5.)

At his first visit with Defendant Dr. Olivarez, Olivarez told Plaintiff he would need his teeth cleaned and a filling before he could receive dentures, and Plaintiff told Olivarez he could skip the cleaning and filling and "go right to dentures since [Olivarez] was not giving [Plaintiff] a dental plan and leaving it up to [Plaintiff] to fill out [HNR] requests for dental needs." (Doc. 37 at 6 ¶ 9.) Olivarez became upset and told Plaintiff, "This is prison[;] you will be lucky to get dentures before you['re] released." (*Id.*) In two HNRs dated January 14, 2020, Plaintiff wrote that he would like to get his cleaning ASAP and a filling so he could begin the process for dentures as he only had 7 lower teeth. (Doc. 37-3 at 30, 32.)

On January 14, 2020, Dr. Olivarez saw Plaintiff, reviewed dental x-rays taken on November 22, 2019, and provided Plaintiff with a gross debridement, and removal of calculus, build up, stains, and plaque. (Doc. 34 ¶¶ 2-3.)

On January 17, 2020, J. Bracamonte responded to Plaintiff's January 14, 2020 HNRs, stating that Plaintiff was treated on January 14, 2020 for his teeth cleaning and that he was on the routine waiting list for a filling. (Doc. 37-3 at 30, 32.)

On March 13, 2020, Plaintiff submitted a request to have his right upper wisdom tooth extracted on the same day as the tooth filling so that he did not have to receive care twice. (Doc. 34 ¶ 7; Doc. 34-1 at 11.) On April 10, 2020, Josephine Bracamonte noted in Plaintiff's medical record that he was treated that day for an urgent extraction of tooth number 1 and was on the routine waiting list for a filling. (Doc. 34-1 at 11.)

On April 10, 2020, Plaintiff saw Dr. Olivarez for the tooth extraction and signed a consent form for the procedure. (Doc. 34 ¶¶ 8-9.) After Dr. Olivarez began extracting Plaintiff's Tooth No. 1, the tooth dislodged in Plaintiff's sinus region. (*Id.* ¶ 10.) Plaintiff had told Dr. Olivarez that his outside dentist said the wisdom tooth was impacted and he would need surgery to remove it, but Olivarez refused to send Plaintiff to a surgeon "and

attempted the oral surgery himself which he botched lodging [the] tooth into [Plaintiff's] sinus cavity." (Doc. 45-1 (Pl. Decl.) ¶ 4.) Dr. Olivarez packed the site with gel foam, told Plaintiff a referral to oral surgery may be warranted if complications arose, and ordered Tylenol and Ibuprofen for Plaintiff. (Doc. 34 ¶¶ 11-12.) Plaintiff left the dental clinic but then returned when the oral packing dislodged, and Dr. Olivarez noted there was "open communication" between the nasal and oral cavity. (*Id.* ¶ 13; Doc. 37-3 at 24.) In response to this development, Dr. Olivarez re-packed and stitched the site, started an antibiotic regimen as a precautionary measure to prevent infection, and referred Plaintiff to an oral surgeon for evaluation. (Doc. 34 ¶ 14.) Plaintiff was told that providers would monitor the area and was educated that the tooth would likely reabsorb over time. (*Id.* ¶ 15.)

Dr. Olivarez submitted a Consultation Request, dated April 14, 2020, and requested that Plaintiff be seen off-site at Desert Valley Oral Surgery in Queen Creek to "evaluate for removal of #1, and possible repair of sinus wall." (Doc. 34-1 at 24.) Dr. Olivarez noted that tooth #1 dislodged during an extraction procedure and migrated into the sinus, and Plaintiff displayed "signs of oroantral communication." (*Id.*) On April 29, 2020, Plaintiff received approval for the oral surgery referral. (Doc. 34 ¶ 17.)

On April 17, 2020, Plaintiff reported to medical that he thinks he "blew his blood clot out" from where his wisdom tooth was extracted, his face was swollen, and he was in a lot of pain. (Doc. 37-3 at 18.) Plaintiff saw Dr. Olivarez that day, and Dr. Olivarez noted Plaintiff was already receiving antibiotics and provided Plaintiff with 30 tablets of Ibuprofen 600 mg to alleviate any pain at the site. (Doc. 34 ¶¶ 18-19.) Plaintiff asserts that he only received medications from Olivarez "at the time of botched surgery or slightly after[.] Olivarez prescribed antibiotics once & refused further antibiotics."[1] (Doc. 45 at 4 ¶ 19.)

---

[1] Plaintiff does not say when Dr. Olivarez refused to prescribe additional antibiotics and he does not specifically dispute that Dr. Olivarez provided him with Ibuprofen on April 17 and May 1, 2020, or that Dr. Olivarez provided him with an antibiotic and pain reliever in December 2020.

On May 1, 2020, Plaintiff reported to medical that the hole in his sinus cavity was now infected and causing pain and "a gross yellow-green mucus that leaves a nasty taste in [his] mouth[.]"  (Doc. 37-3 at 16.)  Plaintiff saw Dr. Olivarez that same day, and Dr. Olivarez noted a "slight discharge at the extraction site and discomfort at the site."  (Doc. 34 ¶ 20.)  Dr. Olivarez provided another 30 tablets of Ibuprofen 600 mg and noted that Plaintiff had just finished his antibiotic regimen.  (*Id.* ¶ 21.)  The assessment notes in Plaintiff's medical record state that the oral surgery consultation was in progress, that anti-inflammatory medications were being deployed, and Plaintiff was "informed about anti-biotic 'saturation' and infection/suppression – in the body."  (Doc. 34-1 at 36.)

Defendants assert that on June 1, 2020, "Plaintiff refused to attend his previously-scheduled oral surgery consult."  (Doc. 34 ¶ 22.)  Dr. Olivarez states in his Declaration that Plaintiff "was scheduled to meet with an oral surgeon" that day but "he refused to attend the consultation."  (Doc. 34-2 at 43 ¶ 13.)  Plaintiff states he never refused a consult and told a prison dentist, Dr. Tuckett, he wanted surgery but did not want to be examined or touched by a prison dentist since he already had a severe injury.  (Doc. 45 ¶ 22; Doc. 45-1 ¶ 5.)  Plaintiff left that appointment assuming he would have the surgery because he was not told otherwise.[2]  (Doc. 45 ¶ 22.)

On June 5, 2020, Josephine Bracamonte noted in Plaintiff's medical record, apparently in reference to Plaintiff's request for a filling, that Plaintiff was "not yet seen due to no enhanced PPE available, due to COVID 19."  (Doc. 34-1 at 11.)

On July 28, 2020, Plaintiff submitted an HNR asking to see an oral surgeon for the impacted wisdom tooth that "was sucked into [his] sinus cavity" when the dentist tried to remove it.  (Doc. 34-1 at 40.)  Plaintiff said he continued to have bad headaches, sharp pains, and sinus infections.  (*Id.*)

---

[2] Neither party makes clear what happened on June 1, 2020, and whether Plaintiff actually refused to go to an offsite consultation with an oral surgeon, as Dr. Olivarez had requested, or if Plaintiff refused to see a prison dentist that day.  Neither party has submitted a medical record for June 1, 2020 that might help clarify what happened.  The Consultation Request form only has a notation for June 1, 2020 stating the oral surgery consult was "Cancelled  REASON: Inmate Refused  BY STAFF: Baird, Robert, DDS." (Doc. 34-1 at 24.)

On July 30, 2020, Plaintiff refused to be seen by Dr. Ray Tuckett for an evaluation (Doc. 34 ¶¶ 24-25; Doc. 37-3 at 12.)  The Refusal to Submit to Treatment form states that Plaintiff was there for "urgent/follow Appt. (tooth #1)," and Plaintiff wrote on the form that he was refusing to see the dentist "due to the poor care and injury [he] received in the past."  (Doc. 37-3 at 10.)  Plaintiff told Dr. Tuckett that he wanted to have surgery but "declined to have any further examinations by Dental Staff since he was quite sure the tooth was still lodged in his head and he was approved for surgery."  (Doc. 37 at 10 ¶ 8.)  According to Plaintiff, there was no reason for him to be reevaluated by a prison dentist since the prison already knew about the injury and that Plaintiff needed surgery.  (Doc. 45 ¶ 25.)  Josephine Bracamonte wrote in Plaintiff's prison medical record that Plaintiff had submitted two urgent HNRs relating to his dental issue and that he arrived at the medical unit that day angry and wanting to refuse "dental urgent/follow up appt for tooth #1 in sinus."  (Doc. 34-2 at 6.)  Bracamonte wrote she tried to explain to Plaintiff why his oral surgeon appointment was delayed but Plaintiff said Bracamonte did not know the law and she could not put a hold on dental treatment for inmates.  (*Id.*)  Bracamonte said she tried to explain that the entire state was put on hold, not by her, but by the state due to the executive order.[3]  (*Id.*)

On August 3, 2020, Plaintiff submitted an HNR asking when he would see an oral surgeon.  (Doc. 34-2 at 10.)  The response from RN Knourek dated August 4, 2020, states "Authorization for consult obtained; pending scheduling."  (*Id.*)

On August 8, 2020, NMI Lasonia Carr responded to Plaintiff's informal grievance dated July 19, 2020, in which Plaintiff said he had been experiencing post-op complications since the removal of a wisdom tooth, including persistent pain and infections, and that he

---

[3] Again, the record is not clear whether a new appointment with an oral surgeon was being scheduled after the June 1, 2020 appointment was canceled, if indeed that appointment was with an oral surgeon and not a prison dentist.  And, Bracamonte's notes suggest the June 1, 2020 appointment was only delayed due to outside circumstances and not because Plaintiff refused to see someone on June 1, 2020

had not seen the specialist yet.  (Doc. 37-2 at 4.)  Carr responded that Plaintiff's medical chart was reviewed, and

> A consult for oral surgery was submitted in April 2020. Authorization was obtain[ed] in early June.  The delay in scheduling is due to Executive Order 2020-10, which suspended services for COVID 19 precautions.  Be assured, you will be scheduled for the first available appointment.  You were last seen by the dentist on 7/30/2020.  Per documentation you refused to allow the dentist to evaluate you.   Per documentation you came into the health unit angry wanting to refuse the appointment.  The dentist attempted to speak with you and explain the reason for the delay in seeing the specialist. Per documentation you raised your voice, stated you were getting out in 7 months and you would take care of it on your own.  The dentist was not able to complete an evaluation as you refused the appointment.  You have been seen by dental for urgent issues on 4/10, 4/17, and 5/1, refusing your appointment on 7/30/2020.  There is no evidence that you are being neglected or treated with deliberate indifference.  You made a choice to refuse the evaluation on 7/30/2020.  If your symptoms should change or worsen please submit an HNR to medical.

(Doc. 37-2 at 4.)

On August 12, 2020, Plaintiff was scheduled to see prison dentist John Jang regarding his request to see an oral surgeon and to have a cavity filled, but Plaintiff refused to be seen despite being told his refusal would delay his referral to an oral surgeon.  (Doc. 34 ¶¶ 27-28.)   The Refusal to Submit to Treatment form states Plaintiff was there for "(Possible) Filling & new O.S. Consult (Due to 7/30/20 refusal)."   (Doc. 37-3 at 33.) Plaintiff wrote on the form that he refused to see the dentist "due to their clear deliberate indifference to [his] needs" and that he "received a serious ongoing injury from Dr. Olivarez and will not be subject to any more injury." (Doc. 37-3 at 33.)  Plaintiff says he never met or spoke with Dr. Jang that day and was never told that his refusal to be examined would delay or prevent surgery.  (Doc. 45 ¶¶ 27-28.)

Plaintiff's medical record indicates he submitted an HNR on August 20, 2020, stating he had a severe sinus infection, that the dentist tried to remove a wisdom tooth and the "dentist slipped," and the tooth was now sitting in his sinus cavity.  (Doc. 37-3 at 35.) Plaintiff said he has headaches and keeps getting sinus infections, his mouth tastes like there is something dead in it, he refuses to see the onsite dentist, and he wanted to be sent offsite to an oral surgeon.  (*Id.*)

On September 1, 2020, in response to an August 12, 2020 Inmate Grievance by Plaintiff, Facility Health Administrator (FHA) M. Smith wrote:

> Per documentation, you repeatedly refuse to be evaluated or cooperate with the dentist.  You have been seen by dental for urgent issues on 4/10, 4/17, and 5/1, refusing your appointment[s] on 7/30/20 & 8/12/20.  A consult for oral surgery was submitted in April 2020 and approved in June 2020.  On 7/30/20, you were scheduled to Dr. Tuckett for evaluation of the impacted tooth.  You were advised that this evaluation was necessary to attend the off-site oral surgery consult.  Per documentation, you refused the evaluation.  On 8/12/20, you were again scheduled with dental and refused this visit.  Per documentation, you refused to be seen even though you were told that this would prevent you from going to the offsite oral surgeon for the 3rd molar removal from maxillary sinus.  You have been evaluated and treated for infection.  You have been on Augmentin, Penicillin and Doxycycline for infection[.]  You continue to refuse evaluation and treatment, which has resulted in the oral surgery consult being cancelled. You advised [sic] that you would need to submit new HNR to get the oral surgery referral process started again.  Without your full cooperation, the treatment plan cannot be fully implemented.

(Doc. 37-2 at 6.)[4]

At a sick call encounter on September 3, 2020, Plaintiff was seen for a recurrent and persistent sinus infection.  (Doc. 37-3 at 37.)  Plaintiff reported having a yellow, thick mucus-like drainage from his upper right wisdom tooth and episodes of infections over the

---

[4] It is unknown when Plaintiff received this response to his grievance.

last 5 months.  (*Id.*)  Plaintiff complained of ear pain, jaw pain, and headaches that he was treating with Ibuprofen.  (*Id.*)  Plaintiff's medical records indicate he submitted an HNR on September 7, 2020, stating that he "refused to be treated by Olivarez but have never refused oral surgery" and he "would like to see surgeon." (*Id.* at 39.)

On September 21, 2020, FHA M. Smith responded to a Grievance Plaintiff filed on August 29, 2020 regarding his dental care.  Smith wrote:

> Per documentation, you have demonstrated a persistent disregard for the dental staff and their intentions.  On 3/5/20, you were seen in order to have a cavity filled.  You also complained of a painful tooth.  You were advised that the painful tooth would have to be a separate visit and that you needed to put in an HNR.  You became visibly angry and verbally abusive.  You were escorted from the dental office. This visit was terminated.  On 4/10, you had a wisdom tooth removed with some complication.  The area was packed and you were seen on 4/17 and 5/1 in follow-up.  On 6/1, you refused the in-house oral surgery consult.  On 7/30/20, you were scheduled to Dr. Tuckett for evaluation of the impacted tooth.  You refused this appointment.  On 8/12/20, you refused this dental appointment.  You were advised that this would prevent you from going to the offsite oral surgeon for the 3rd molar removal from maxillary sinus.  You were told that you would have to submit new HNR to get the oral surgery referral process started again.  Recently, on 9/7/20, you were seen by nursing.  You demanded to be referred directly to the oral surgeon.  It is documented that you stated you do not want to see Dr. Olivarez.  In order for an oral surgery consult to be submitted, you must see the on-site dentist for evaluation.  You had a teeth cleaning on January 14, 2020.  You are allowed one cleaning per year.  In order to move forward with dentures [sic]
>
> It is evident that Centurion dental has afforded you every opportunity to address your dental needs.  Without your cooperation, implementing the treatment plan is impossible.

(Doc. 37-2 at 7.)

On December 15, 2020, Plaintiff submitted an HNR stating he was "in severe pain from a botched dental procedure about 8 months ago.  I currently have a wisdom tooth lodged in my sinus cavity.  It is infected now for the 5th time.  I would like to see my P.C.P.

for antibiotics & pain meds, as well as being sent for surgery.  (Doc. 34-2 at 20.)  The response dated December 16, 2020 states "Defer to Dental."  (*Id.*)

In an Inmate Letter dated December 15, 2020, addressed to ADON RN J. Knourek, Plaintiff wrote about the impacted tooth in his sinus cavity since April 2020, that he told Dr. Olivarez the tooth was impacted and his outside dentist said he would need oral surgery, but Olivarez told him an oral surgeon was not necessary and attempted to remove the tooth. (Doc. 37-2 at 3.)  Plaintiff said he filed a grievance and was told he was approved for oral surgery in June and that he would not allow Olivarez to examine him or perform any other procedures on him and all he wanted was to see an oral surgeon.  (*Id.*)  Plaintiff said he told Olivarez he would be seeking legal recourse and Olivarez, in turn, "lied on medical records stating [Plaintiff] refused surgery," which has left Plaintiff suffering for eight months.  (*Id.*)

On December 16, 2020, RN Joanna Jones saw Plaintiff and referred him for follow up with a dentist.  (Doc. 34 ¶ 30.)  On December 23, 2020, Plaintiff saw Dr. Olivarez and "reported discomfort in the area of the tooth extraction."  (*Id.* ¶ 31.)  Dr. Olivarez noted that Plaintiff had a recurrent infection and prescribed an antibiotic, Clindamycin, and Acetaminophen 325 mg, and referred Plaintiff again for an offsite consult with an oral surgeon.  (*Id.* ¶ 32.)  Plaintiff disputes that he saw Olivarez on this date despite Olivarez's signature on the medical records.  (Doc. 45 ¶ 31.)  Plaintiff does not dispute that Olivarez prescribed an antibiotic and pain reliever and referred Plaintiff for an offsite oral surgery consult.  (*Id.* ¶ 32.)  The offsite consult was approved on January 6, 2021.  (Doc. 34 ¶ 33.)

On January 13, 2021, RN Knourek responded to Plaintiff's December 15, 2020 Inmate Letter that Plaintiff had been approved for oral surgery by an outside provider and was being scheduled.  (*Id.* at 2.)

On February 9, 2021, Plaintiff was taken to Southern Arizona Oral & Maxillofacial Surgery where he had surgery to remove the tooth.  (Doc. 34 ¶ 34.)  Plaintiff tolerated the surgery well and was discharged in stable and satisfactory condition.  (*Id.*)

1    Although Plaintiff requested a lower denture from Olivarez in January 2020, the

2    denture was never made, and Plaintiff's cavity was never filled.  (Doc. 45-1 ¶ 3; Doc. 37

3    at 10 ¶ 2.)  Plaintiff was released from ADCRR on March 4, 2021.  (Doc. 37 at 2.)

4    **V.   Eighth Amendment Legal Standard**

5         To support a medical care claim under the Eighth Amendment, a prisoner must

6    demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d

7    1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are

8    two prongs to the deliberate-indifference analysis: an objective standard and a subjective

9    standard.  First, a prisoner must show a "serious medical need." *Id.* (citations omitted).  A

10   "'serious' medical need exists if the failure to treat a prisoner's condition could result in

11   further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*,

12   974 F.2d at 1059–60 (internal citation omitted).  Examples of a serious medical need

13   include "[t]he existence of an injury that a reasonable doctor or patient would find

14   important and worthy of comment or treatment; the presence of a medical condition that

15   significantly affects an individual's daily activities; or the existence of chronic and

16   substantial pain." *Id.* at 1059–60.

17        Second, a prisoner must show that the defendant's response to that need was

18   deliberately indifferent. *Jett*, 439 F.3d at 1096.  An official acts with deliberate indifference

19   if he "knows of and disregards an excessive risk to inmate health or safety"; to satisfy the

20   knowledge component, "the official must both be aware of facts from which the inference

21   could be drawn that a substantial risk of serious harm exists, and he must also draw the

22   inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "Prison officials are

23   deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or

24   intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th

25   Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to

26   a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096.  Deliberate indifference

27   is a higher standard than negligence or lack of ordinary due care for the prisoner's safety.

28   *Farmer*, 511 U.S. at 835.  "Neither negligence nor gross negligence will constitute

deliberate indifference." *Clement v. California Dep't of Corrs.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## VI.   Discussion

### A.   Serious Medical Need

There is no dispute that Plaintiff's impacted wisdom tooth that dislodged into his sinus cavity constituted a serious medical need. The available medical records show that Plaintiff's condition was "worthy of comment or treatment" including referrals to an oral surgeon, multiple prescriptions for antibiotics and pain relief, and eventually oral surgery to remove the tooth lodged in his sinus cavity. *See McGuckin*, 974 F.2d at 1059-60. This record supports the finding of a serious medical need with respect to the dislodged tooth.

Although not entirely clear, Plaintiff also appears to claim that Defendants violated his Eighth Amendment rights by not providing a lower denture or filling a cavity. The record is sparse as to these issues. For example, it is not clear if Plaintiff was seeking a replacement denture or simply had no dentures at all and who, if anyone, had recommended he have a lower denture made and why. As to the filling, the record shows that Plaintiff refused at least one appointment to have the filling done and there is no evidence that the

lack of a filling interfered with Plaintiff's daily activities or caused chronic and substantial pain. As such, the record fails to support that either of these issues constituted serious medical needs, and the remainder of this Order will focus on whether Defendants were deliberately indifferent to Plaintiff's serious medical needs regarding the wisdom tooth dislodged into his sinus cavity.

### B. Deliberate Indifference

#### 1. Dr. Olivarez

The record reflects that Plaintiff saw Dr. Olivarez five times. The first was on January 14, 2020, when Olivarez told Plaintiff he would need a cleaning and filling before Plaintiff could get dentures, and Olivarez cleaned Plaintiff's teeth that day. (Doc. 34 ¶¶ 2-3; Doc. 37 at 6 ¶ 9.) The second visit was on April 10, 2020, when Olivarez tried to remove Plaintiff's tooth, which dislodged into Plaintiff's sinus region. (Doc. 34 ¶ 10.) Olivarez packed the site with gel foam, ordered Tylenol and Ibuprofen for Plaintiff, and told Plaintiff he may need oral surgery if complications arose. (*Id.* ¶¶ 11-12.) Plaintiff returned to the dental clinic later when the packing dislodged, and Dr. Olivarez stitched the site, started an antibiotic regimen to prevent infection, and submitted a Consultation Request for Plaintiff to see an oral surgeon to evaluate for removal of the tooth and possible repair of the sinus wall, noting there was "open communication" between the nasal and oral cavity. (*Id.* ¶¶ 13-14; Doc. 37-3 at 24.) The request to see an oral surgeon was approved on April 29, 2020. (Doc. 34-1 at 24.)

The third visit with Dr. Olivarez was on April 17, 2020, when Plaintiff reported that he "blew his blood clot out." (Doc. 37-3 at 18.) Dr. Olivarez noted that Plaintiff had "oroantral communication at the extraction site," had already been referred to an oral surgeon for evaluation, and he provided Plaintiff with 30 tablets of Ibuprofen 600mg. (Doc. 34-1 at 29-31.) Plaintiff saw Dr. Olivarez for the fourth time on May 1, 2020 for Plaintiff's report that the attempted tooth extraction had left a hole in his sinus cavity that was now infected and causing pain and yellow-green mucus. (Doc. 34 ¶ 20; Doc. 37-3 at 16.) Dr. Olivarez examined Plaintiff, noted the discharge and discomfort, that Plaintiff had

just finished his antibiotic regimen, and the oral surgery consultation was in progress; Dr. Olivarez provided another 30 tablets of Ibuprofen.  (Doc. 34-1 at 34-37.)

The next and last encounter between Plaintiff and Dr. Olivarez was on December 23, 2020.  The parties dispute whether Plaintiff saw Dr. Olivarez that day, but Plaintiff does not dispute that Olivarez prescribed an antibiotic and pain reliever and again referred Plaintiff for an offsite oral surgery consult, which was approved on January 6, 2021.  (Doc. 34 ¶ 32; Doc. 45 ¶¶ 31-32.)

Plaintiff argues that he told Dr. Olivarez before he tried to remove the impacted wisdom tooth that his outside dentist said Plaintiff would need oral surgery to remove the tooth, but Olivarez refused to send Plaintiff to an oral surgeon and attempted to remove the tooth himself.  (Doc. 37 at 7; Doc. 45-1 ¶ 4.)  Plaintiff argues that Olivarez is not a licensed oral surgeon and should not have attempted to remove the tooth, and the last time he checked, "performing a surgery you['re] not licensed to perform is a felony" in Arizona. (Doc. 37 at 7.)  Plaintiff does not provide any evidence supporting these statements about Olivarez's licensing or that he was not qualified to remove the tooth.

Based on this record, no reasonable jury would conclude that Dr. Olivarez was deliberately indifferent to Plaintiff's serious medical needs.  While Dr. Olivarez's failed attempt to remove the wisdom tooth that became lodged in Plaintiff's sinus cavity may rise to the level of negligence or possibly malpractice, such failure does not rise to the level of deliberate indifference. *See Clement*, 220 F. Supp. 2d at 1105; *Broughton*, 622 F.2d at 460. In Dr. Olivarez's subsequent encounters with Plaintiff in April and May 2020, he noted that the referral to see an oral surgeon was in progress and he provided Plaintiff with antibiotics and pain relief medication.  There is no evidence that Dr. Olivarez was aware that Plaintiff's June 1, 2020 oral surgery visit was canceled or that he was aware of Plaintiff's subsequent complaints of pain and infection and refusals to see other dentists until December 2020, at which time Dr. Olivarez prescribed an antibiotic, pain reliever, and again requested that Plaintiff see an oral surgeon.  That request was approved in January 2021 and Plaintiff had the surgery in February 2021.

Plaintiff also argues that Dr. Olivarez retaliated against him for seeking legal recourse in this matter, and the retaliation delayed Plaintiff's surgery and left him in severe pain and with multiple infections. (Doc. 37 at 7 ¶ 15.) Plaintiff offers no evidence to support his claim of retaliation other than speculation about the delay. In addition, Dr. Olivarez immediately referred Plaintiff to see an oral surgeon after the initial attempt to remove the wisdom tooth failed, prescribed antibiotics and pain relievers in their subsequent encounters in April and May 2020, and there is no evidence Dr. Olivarez was involved with Plaintiff's dental care again until December 2020 when Dr. Olivarez referred Plaintiff again to an oral surgeon.

Lacking any evidence showing that Dr. Olivarez was deliberately indifferent, the Court will grant summary judgment to Defendant Olivarez.

### 2.   Centurion

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must show that his constitutional rights were violated because of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom was deliberately indifferent; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

Defendants argue in their Motion that Plaintiff cannot demonstrate that Centurion, Shinn, or Olivarez were deliberately indifferent to his dental needs, they were consistently responsive to Plaintiff's dental needs, and Plaintiff cannot demonstrate he suffered any injury as a result of Defendants' alleged deliberate indifference. (Doc. 33 at 7.) Defendants argue in their Response to Plaintiff's Motion that, although it was likely Plaintiff's

dislodged tooth would reabsorb into his body, Plaintiff was immediately scheduled for an oral surgery consult, he was checked frequently prior to the consult, and despite Plaintiff's initial refusal to attend the consult, he was referred again to an oral surgeon who ultimately removed the tooth without any complications.  (Doc. 41 at 7.)

Plaintiff argues that his medical records prove he never refused surgery and that "staff/Olivarez were playing games with providing treatment by blocking [his] surgery." (Doc. 44 at 4.)  As to Defendants' contention that Plaintiff "refused to be examined by medical staff after injury," Plaintiff states it "is correct [he] refused to be examined as he was fearful of any further injury by a dental team that does not know what the[y're] doing." (*Id*. at 5.)  Plaintiff states that he always requested to have surgery, that "no evaluation was needed for him to have surgery," and it was Centurion's own dentist who caused the injury. (*Id*.)  Plaintiff states that he was left in severe pain and had to fight multiple sinus infections that left him bedridden for days at a time.  (*Id*. at 5-6.)

Defendants reply that the delay in Plaintiff's oral surgery was caused by Plaintiff himself by his refusal "to appear for his initial appointment with an oral surgeon" and repeated refusals to allow dental providers to evaluate his mouth so that a new consultation with an oral surgeon could be scheduled.  (Doc. 46 at 1.)

### a.    Constitutional Injury

It is not clear what happened with Plaintiff's oral surgery consult on June 1, 2020. Defendants assert that Plaintiff refused to attend his oral surgery consult that day, but it appears Plaintiff was not provided an offsite consult with an oral surgeon, as Dr. Olivarez requested, but was required to be seen by another onsite prison dentist.  Defendants provide no evidence or explanation why Plaintiff needed to see a prison dentist that day or why Dr. Olivarez's recommendation that Plaintiff see an offsite oral surgeon was not followed.  In addition, while Defendants say Plaintiff refused to see the oral surgeon on June 1, 2020, other evidence in the record suggests the oral surgery consult did not happen because of an Executive Order related to the COVID-19 pandemic.  Plaintiff says he never refused the offsite consult and told the prison dentists he wanted surgery, but he did not want to be

examined or touched by a prison dentist, and he states he was never told that he would not be able to see an oral surgeon unless he was evaluated again by a prison dentist.

While a prisoner may not demand a specific type of care, this is a case where a prison medical provider ordered specific care—an oral surgery consult—and that did not happen in a timely manner. After June 1, 2020, it took another nine months before Plaintiff saw an oral surgeon to remove the dislodged tooth. Defendants argue this delay was of Plaintiff's own making because he refused to be evaluated by a prison dentist, but Defendants provide no evidence why it was necessary for Plaintiff to see another prison dentist after Dr. Olivarez had already requested that Plaintiff be sent to an offsite oral surgeon, and Plaintiff claims he was not told at the time that this would result in his not seeing the oral surgeon. The only evidence suggesting Plaintiff had to see a prison dentist again before seeing an oral surgeon is from FHA Smith in her September 2020 responses to Plaintiff's grievances, but this explanation came months after the fact; there is no evidence Plaintiff was told this step was necessary at the relevant time, and there is no explanation from a provider explaining why this step was necessary. Moreover, just a month earlier, a different administrator, Lasonia Carr, responded to a grievance from Plaintiff that his oral surgery consult was delayed due to the Executive Order and COVID-19 and that Plaintiff would be scheduled for the first available appointment. That same month (August 2020), a response to one of Plaintiff's HNRs stated that authorization for the oral surgery consult was obtained and it was pending scheduling. Nonetheless, Plaintiff still did not receive his oral surgery consult for another six months. The lack of clarity and contradictory explanations in the record about why the recommendation of Plaintiff's treating dentist, Dr. Olivarez, was not followed creates a question of fact that Centurion deliberately disregarded Plaintiff's serious medical need to see an oral surgeon. The Ninth Circuit and other courts have routinely found that failure to follow a treating specialist's or even a treating provider's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of

treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs).  In addition, the record is replete with Plaintiff's repeated requests after June 1, 2020 to see an oral surgeon and complaints about the severe pain and infections he was suffering, which indicate the delay in proper treatment caused Plaintiff harm.  *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

As stated, "[p]rison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett*, 296 F.3d at 744, or when they fail to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  Here, there was a ten-month delay between Dr. Olivarez's initial request for Plaintiff to see an offsite oral surgeon and when Plaintiff saw an oral surgeon, and Plaintiff repeatedly complained of pain and infections during the delay and repeatedly requested to see an oral surgeon.  Although the evidence supports that Plaintiff was offered some treatment within the prison, which he refused, a failure to adequately treat a serious medical condition, even if some treatment is provided, may constitute deliberate indifference in a particular case.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n.10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate

1  indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have
2  to prove that he was completely denied medical care).

3      On this record, a reasonable jury could conclude that Plaintiff suffered a
4  constitutional injury.

5                    **b.    Policy or Custom**

6      A policy is "a deliberate choice to follow a course of action" made by the officials
7  or entity "responsible for establishing final policy with respect to the subject matter in
8  question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). A policy can be one of
9  action or inaction. *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). A "custom"
10 for purposes of municipal liability is a "widespread practice that, although not authorized
11 by written law or express municipal policy, is so permanent and well-settled as to constitute
12 a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).
13 "Liability for improper custom may not be predicated on isolated or sporadic incidents; it
14 must be founded upon practices of sufficient duration, frequency and consistency that the
15 conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99
16 F.3d 911, 918 (9th Cir. 1996). While one or two incidents are insufficient to establish a
17 custom or practice, the Ninth Circuit has not established what number of similar incidents
18 would be sufficient to constitute a custom or policy. *See Oyenik v. Corizon Health Inc.*,
19 No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could
20 conclude that at least a dozen instances of defendant Corizon denying or delaying
21 consultations and radiation treatment for cancer patient over a year amount to a custom or
22 practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478). But "[t]here is no
23 case law indicating that a custom cannot be inferred from a pattern of behavior toward a
24 single individual." *Id.* Whether actions by entity officers or employees amount to a custom
25 "depends on such factors as how longstanding the practice is, the number and percentage
26 of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose,*
27 *Inc. v. City of Oakland*, C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4,
28 2006).

Defendants argue "[t]here is no evidence in the record, of any policy, custom or practice to consciously disregard any serious dental need of Plaintiff or deny him adequate dental care."  (Doc. 33 at 9.)

Plaintiff, though, had to wait ten months to have oral surgery despite his repeated requests for surgery and complaints of pain and recurrent infections.  This is not a situation of an isolated incident of neglect but of repeated instances of multiple Centurion employees denying or delaying the oral surgery consultation and different employees giving Plaintiff different answers about the status of the oral surgery consult.  No one has provided a clear medical reason for the delay, and the failure to give a consistent reason for the delay indicates deliberate indifference because it suggests that the decisions were arbitrary and so embedded as to be a custom.  Defendants' failure to explain these inconsistencies and the failure to follow the treating dentist's recommendation from April 14, 2020 that Plaintiff see an oral surgeon supports that the failure to adequately address Plaintiff's dislodged tooth did not result from the actions of one or two rogue employees but instead occurred over time and involved numerous Centurion employees.  *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 521 (9th Cir. 1997) (finding a policy more likely where multiple employees were involved in the constitutional violation).  On this record, there is a question of fact whether Centurion staff were acting pursuant to a Centurion policy or custom.  *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–95 (9th Cir. 2002) (whether a policy or custom exists is normally a jury question).

### c.   Deliberately Indifferent Policy/Moving Force

Because deliberate indifference is exhibited where prison officials deny or delay medical treatment and harm results, *see Wood*, 900 F.2d at 1334, an ongoing policy or practice that denies or delays treatment for a serious medical need and thereby causes harm would constitute a deliberately indifferent policy.  To establish that a policy or custom is the "moving force" behind a constitutional violation, a plaintiff must demonstrate a direct causal link between the policy or custom and the constitutional deprivation.  *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

The Court has already found a genuine issue of material fact whether there existed a policy or custom of delaying provider-recommended treatment and a policy or custom of failing to address Plaintiff's need to have the dislodged tooth addressed by a specialist.  An obvious consequence of such a policy or custom may be the denial and delay of constitutionally adequate dental care, which in this case shows a ten-month delay in providing needed treatment.  On this basis alone, the moving-force element is satisfied.  *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by the [entity] . . . itself violates federal law will also determine that the [entity] action was the moving force behind the injury of which the plaintiff complains").

Accordingly, there exists a question of fact whether Centurion had a deliberately indifferent policy that deprived Plaintiff of his constitutional rights, and the Court will deny summary judgment to Centurion.

### 3.      Shinn

The Court's screening Order required ADCRR Director Shinn to respond to Plaintiff's dental care claim in his individual and official capacities.  (See Doc. 6 at 10.)

For a person to be liable in his individual capacity, a plaintiff "must allege facts, not simply conclusions, that show that the individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  Here, there is no evidence that Shinn was personally involved in a deprivation of Plaintiff's civil rights, and the claim against Shinn in his individual capacity will be dismissed.

Plaintiff's official capacity claim against Defendant Shinn is limited to his injunctive relief request for oral surgery.  *See Thornton v. Brown*, 757 F.3d 834, 839 (9th Cir. 2013) (limiting official capacity claims to injunctive relief); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (§ 1983 does not authorize an official capacity suit for money damages); *Green v. Mansour*, 474 U.S. 64, 68 (1985) (a plaintiff may seek only prospective relief against a defendant in his official capacity for a "continuing violation of federal law").  Indeed, it is a defendant's current conduct that determines whether injunctive relief is warranted.  *Farmer*, 511 U.S. at 845-46.

Plaintiff's claim against Shinn in his official capacity for injunctive relief is now moot because Plaintiff has received the oral surgery he sought and because he has been released from ADCRR custody.  "Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) (quoting *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012)).  Although there is an exception to the mootness doctrine for claims that are capable of repetition, yet evade review, that exception is limited to cases where the duration of the challenged action is too short to be fully litigated before it ceases, and where there is a reasonable expectation that the plaintiff will be subjected to the same action again.  *Alvarez*, 667 F.3d at 1064.  The possibility that a prisoner may commit another crime and be returned to custody is too speculative a basis on which to conclude that his claims are capable of repetition.  *Id.* at 1064-65.  Here, there is no evidence of a non-speculative, reasonable expectation that Plaintiff will again be subject to the ADCRR's policies.

Likewise, although an exception to mootness has been recognized where a plaintiff is challenging ongoing policies to which others will continue to be subject, the Ninth Circuit Court of Appeals has not extended this exception beyond "short-lived pretrial proceedings in criminal prosecutions, where civil class actions would not be conducive to obtaining the relief sought."  *Id.* at 1065.  Accordingly, Plaintiff may not obtain injunctive or declaratory relief in this action, and his official capacity claims against Defendant Shinn will be dismissed.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 33) and Plaintiff's Cross-Motion for Summary Judgment (Doc. 37).

(2)     Plaintiff's Cross-Motion for Summary Judgment (Doc. 37) is **denied**.

(3)     Defendants' Motion for Summary Judgment (Doc. 33) is **granted in part** as to Defendants Olivarez and Shinn and Olivarez and Shinn are **dismissed** from this action. Defendants' Motion for Summary Judgment is **denied** as to Defendant Centurion.

(4)     This action is referred to Magistrate Judge John Z. Boyle to conduct a settlement conference on the remaining claim against Defendant Centurion.

(5)     Defense counsel must jointly arrange for the relevant parties to call Magistrate Judge Boyle's chambers at (602) 322-7670 within 14 days to schedule a date for the settlement conference.

Dated this 23rd day of May, 2022.

James A. Teilborg
Senior United States District Judge